IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 02-cv-00311-RPM

CLIMAX MOLYBDENUM COMPANY,

      Plaintiff,

v.

MOLYCHEM, L.L.C.

      Defendant,

v.

CLIMAX MOLYBDENUM COMPANY and
PHELPS DODGE CORPORATION,

      Counterclaim Defendants

---

## ORDER ON PENDING MOTIONS

---

Climax Molybdenum Company ("Climax") commenced this action on February 15, 2002, alleging infringement of U.S. Patent No. 5,985,236 ("the '236 patent") and U.S. Patent No. 6,235,261 ("the '261 patent") by Molychem, L.L.C. ("Molychem"). The inventions of these patents relate to the chemical compound ammonium octamolybdate ("AOM"). The '236 patent claims a purportedly new AOM isomer, X-AOM. The '261 patent relates to a new process for producing X-AOM. The principal commercial use for AOM is as a smoke suppressant. AOM is used in the production of plastic material used for electrical conduit sheathing. Climax claims that

-1-

Molychem infringed the '236 and '261 patents by selling and offering to sell AOM obtained from a Chinese supplier.

This action was stayed for approximately fourteen months, pending the final determination of a proceeding before the United States International Trade Commission ("ITC"). In that proceeding, Climax complained that Molychem and others were violating Section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, by importing and selling within the United States chemical compositions that infringed the '236 patent. The ITC issued its Commission Opinion on August 28, 2003. The ITC found no Tariff Act violation based on its conclusion that the '236 patent is invalid and unenforceable and therefore denied the relief requested by Climax. The ITC found the '236 patent invalid under 35 U.S.C. § 102(b) on three grounds: (1) anticipation by U.S. Patent No. 4,762,700 to Huggins; (2) anticipation by a prior German scientific article, and (3) the claimed invention was on sale more than one year before the patent application's filing date. The ITC also found that inequitable conduct by Climax during the prosecution of the patent rendered the '236 patent unenforceable.

The stay order in this action was vacated after the ITC issued its Opinion. The operative complaint is the second amended complaint, filed May 31, 2002. In its amended answer and counterclaim filed January 29, 2004, Molychem claimed that Climax had violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by seeking to enforce a patent obtained by fraud on the PTO. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965) (holding that a patentee's enforcement of a patent obtained by fraud on the Patent Office may be the basis of an action under Section 2 of the Sherman Act). In July 2005, Molychem filed a second amended

answer and counterclaims.  Molychem's second amended counterclaims expand the alleged antitrust violations and add antitrust claims against Phelps Dodge Corporation ("Phelps Dodge").   The counterclaims are (1) monopolization by Climax in violation of Section 2 of the Sherman Act; (2) attempted monopolization by Climax in violation of Section 2 of the Sherman Act; (3) monopolization by Climax and Phelps Dodge in violation of Section 2 of the Sherman Act, and (4) attempted monopolization by Climax and Phelps Dodge in violation of Section 2 of the Sherman Act.

### Counterclaim defendants' motion to dismiss Molychem, LLC's third and fourth counterclaims and to dismiss Phelps Dodge Corporation as a party

On August 29, 2005, Climax and Phelps Dodge (collectively, "counterclaim defendants") moved pursuant to Fed. Civ. P. 12(b)(6) to dismiss the third and fourth counterclaims, arguing that Molychem's allegations fail to state a claim against Phelps Dodge for monopolization or attempted monopolization under Section 2 of the Sherman Act.  To determine this motion, the well-pleaded allegations of fact are accepted as true and construed in a light most favorable to the counterclaimant, Molychem.

Molychem alleges the following:  Molybdenum is one of the primary raw materials used in the production of AOM.  (Sec. Am. Countercl. ¶ 5).  Molybdenum comes from mines where molybdenum is the primary product and copper mines where molybdenum production is secondary to copper mining.  (*Id.* ¶ 1).  Phelps Dodge, a leading producer of copper in the United States, produces approximately 30,000,000 pounds of molybdenum per year as a by-product of its copper operations.  (*Id.*).  Climax is a wholly-owned subsidiary of Phelps Dodge.  (*Id.*).  Climax mines molybdenum and produces approximately 27,500,000 pounds of molybdenum per year.

(*Id.*).  In 2004, Climax and Phelps Dodge together produced enough molybdenum to satisfy nearly 77% of the consumption of molybdenum in the United States.  (¶ 3).

In addition to mining molybdenum, Climax processes and markets molybdenum-based products made from the molybdenum produced by it and by Phelps Dodge.  One of those products is AOM.  (¶¶ 2, 7).  Phelps Dodge and Climax, through their dominance of the molybdenum market, control 60% of the market for AOM.  (¶¶ 6-9).  Molybdenum-based additives, especially X-AOM, are useful in the manufacturing of PVC jacketing used for telecommunications cabling for use in plenum areas.  (¶ 20).  X-AOM has emerged as the only commercially viable molybdenum-based smoke suppressant for such PVC jacketing.  (*Id.*).  Climax maintains a market share of more than 90% of the market for molybdenum-based smoke suppressant additives for the PVC jacketing of telecommunications plenum cabling.  (¶¶ 50, 74-76).

Molychem alleges that Climax and Phelps Dodge, acting in concert, have engaged in three categories of conduct designed to restrain trade and maintain a monopoly over the United States market for molybdenum-based smoke suppressant additives for the PVC jacketing of telecommunications plenum cabling.  First, Molychem asserts that the '236 and '261 patents were obtained through fraud on the Patent Office and that the enforcement of these patents is an anticompetitive act.  (¶¶ 13a, e and f, 25-33).  Second, Molychem alleges that Climax and Phelps Dodge have engaged in a "price squeeze," using their dominance in the molybdenum market to keep the price of molybdenum high, while Climax has maintained a constant price or lowered its price for AOM.  Molychem avers that the alleged price squeeze is designed to eliminate competitors in the relevant market.  (¶¶ 13g, 34-38).  Third, Molychem alleges that Climax and

Phelps Dodge have intimidated consumers through "refusals to deal." Molychem alleges that Climax and Phelps Dodge tell consumers that unless they purchase molybdenum-based products from Climax, they will not be assured of a source of molybdenum during periods of market-wide shortages. (¶¶ 13b and c, 39-46). Molychem states that Climax and Phelps Dodge have instituted a pricing structure whereby customers who routinely purchase their molybdenum-based products from Climax are assured that they can purchase such products at sub-market prices during periods when molybdenum is in short supply. According to Molychem, this pricing structure is designed to extend the dominance enjoyed by Climax and Phelps Dodge and to intimidate consumers who might otherwise purchase from a competitor such as Molychem. (¶¶ 42-46).

"The elements of monopolization under Section 2 are 'the possession of monopoly power in the relevant market' and 'the willful acquisition of monopoly power, as opposed to growth as a result of superior power, business acumen, or historic accident.'" *Reazin v. Blue Cross & Blue Shield*, 899 F.2d 951, 973 (10th Cir. 1990) (quoting *Bright v. Moss Ambulance Serv.*, 824 F.2d 819, 823 (10th Cir. 1987) and *United States v. Grinnell Corp.*, 384 U.S. 563, 570-571 (1966)). To establish a claim for attempted monopolization under section 2 of the Sherman Act, a plaintiff must prove: "(1) the relevant market, including both geographic and product market, in which the alleged attempt occurred; (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such attempt." *Nobody in Particular Presents v. Clear Channel Communications*, 311 F.Supp.2d 1048, 1098 (D. Colo. 2004)(citing *Colo. Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F.2d 683, 694 n.18 (10th Cir. 1989)). A plaintiff seeking damages for an alleged antitrust violation must also show an antitrust injury. *Clear Channel Communications*, 311 F.Supp.2d at 1097 (citing

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)).

Molychem's counterclaims define the relevant product market as "the market for molybdenum-based smoke suppressant additives for the PVC jacketing of telecommunications plenum cabling." The relevant geographic market is the United States. (¶¶ 48-49, 61-62, 74-75, and 87-88). Climax competes in that market. Phelps Dodge produces molybdenum, but it does not sell molybdenum-based smoke suppressant additives. The claims against Phelps Dodge are based on allegations of "concerted activity" by Climax and Phelps Dodge. (¶¶ 76, 78-80, 82-84, and 89).

The counterclaim defendants characterize the claims against Phelps Dodge as conspiracy claims. They seek dismissal of the third and fourth counterclaims and the dismissal of Phelps Dodge as a counterclaim defendant, arguing that a parent corporation cannot be held liable for conspiring with its own wholly-owned subsidiary to violate the federal antitrust laws. The counterclaim defendants contend that *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) requires dismissal of Molychem's antitrust claims against Phelps Dodge.

In *Copperweld*, the United States Supreme Court addressed the issue of whether a parent and its wholly owned subsidiary are capable of conspiring in violation of the Section 1 of the Sherman Act. A conspiracy requires a combination of two or more conspirators, thus the question presented was whether a parent and its subsidiary should be considered separate entities or a single entity for the purpose of determining the existence of a conspiracy. Rejecting the "intra-enterprise conspiracy doctrine," the Court stated that "the coordinated activity of a parent and its wholly-owned subsidiary must be viewed as a single enterprise for purposes of § 1 of the Sherman Act." 467 U.S. at 771. In that context, the Court found no substantive difference

between a single corporation with multiple divisions and a corporation having a wholly owned subsidiary. *Id.* at 773-774. The Court thus held that a parent and its wholly owned subsidiary "are incapable of conspiring with each other for purposes of § 1 of the Sherman Act." *Id* at 777.

*Copperweld* did not address a parent corporation's liability under Section 2 of the Sherman Act. Indeed the Court emphasized the distinction between the types of conduct prohibited by Sections 1 and 2. 467 U.S. at 767-69. The Court's rejection of the intra-enterprise conspiracy doctrine was based in part on its view that liability under Section 1 was unnecessary because concerted anti-competitive activity of a parent and subsidiary could be reached under Section 2 of the Sherman Act:

> Any anticompetitive activities of corporations and their wholly owned subsidiaries meriting antitrust remedies may be policed adequately without resort to an intra-enterprise conspiracy doctrine. A corporation's initial acquisition of control will always be subject to scrutiny under § 1 of the Sherman Act and § 7 of the Clayton Act, 38 Stat. 731, 15 U.S.C. § 18. *Thereafter, the enterprise is fully subject to § 2 of the Sherman Act* and § 5 of the Federal Trade Commission Act, 38 Stat. 719, 15 U.S.C.§ 45.

467 U.S. at 777 (emphasis added).

A Section 2 claim brought against a parent corporation based on anticompetitive activity occurring at the subsidiary level is sufficient if there are factual allegations showing that the subsidiary is the alter ego of the parent, *see Clear Channel Communications*, 311 F.Supp. at 1072, or showing independent conduct on the part of the parent. *Id.* at 1068-69. "When the parent controls, dictates or encourages the subsidiary's antitcompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act." *Id.* at 1071.

*Copperweld* does not foreclose Molychem's claims against Phelps Dodge. Phelps Dodge

and Climax both produce molybdenum.  The allegations are that their vertical integration and combined strength in the molybdenum market has allowed Climax to acquire and maintain monopoly power in the market for molybdenum-based smoke suppressant additives.  The counterclaims include specific facts about each corporation's share of the molybdenum market and Climax's share of the AOM market.  It is alleged that both Climax and Phelps Dodge participated in the "price squeeze" and refusals to deal and that these activities were undertaken with the intention of monopolizing the relevant market.  The fact that the alleged combination involves related corporations does not allow one of them to escape liability.

To the extent that Molychem's antitrust claims arise out of the enforcement of patents allegedly procured by fraud, no facts are alleged to support the liability of Phelps Dodge.  A claim for patent infringement can be brought only by the patentee or an exclusive licensee.  *See Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1376-77 (Fed. Cir. 2000).  Climax owns the patents. Molychem has not alleged facts showing that Phelps Dodge has any right to enforce the patents or that it controlled, or dictated, or encouraged their enforcement by Climax.  Nevertheless, Molychem's allegations about the alleged price squeeze and refusals to deal are sufficient to support its antitrust claims against Phelps Dodge.

### Motion to bifurcate patent claims and antitrust claims and to stay discovery on antitrust counterclaims

On October 3, 2005, Climax and Phelps Dodge moved to bifurcate the trial of its patent claims and the trial of Molychem's antitrust counterclaims.  They also seek a stay of all discovery related to the antitrust counterclaims until there has been a complete resolution of the patent issues.  Molychem opposes separate trials and the requested stay of discovery.

-8-

Rule 42(b) provides in pertinent part:

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

The determination of whether to conduct separate trials is a matter committed to the discretion of the trial court. *Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 964 (10th Cir. 1993). Factors to be considered are whether separate trials will promote convenience, expediency, and economy, whether the issues are separable, whether separate trials would be unfair or prejudicial to any party. *Id.*; *see also In re Innotron Diagnostics*, 800 F.2d 1077, 1085 (Fed. Cir. 1986) (describing the applicable considerations as "expedition, economy, prejudice, convenience, expense, a just final disposition, and preservation of the right to jury trial").

The Federal Circuit has noted that district courts often order separate trials of patent and antitrust claims. *See In re Innotron Diagnostics*, 800 F.2d at 1084.  A patent is presumed valid, and a "patentee's infringement suit is presumptively in good faith." *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 996 (9th Cir. 1979).  Separating the trials of the patent and antitrust issues "prevents antitrust and unfair competition claims from becoming a counterclaim intended to cause expensive litigation and to dissuade a patent holder from trying to enforce his patent rights." *Excrix Corp. v. Exabyte Corp.*, 191 F.R.D. 611, 614 (D. Colo. 2000).  Bifurcation of patent and antitrust claims, however, is not mandated.  *See In re Theodor Groz & Sohne*, 1992 WL 188908 (Fed. Cir. 1992) (upholding trial court's denial of bifurcation).

The commonality between Molychem's defense of inequitable conduct and its *Walker*

*Process* antitrust claim weighs against bifurcation.  Molychem's defense of inequitable conduct is based on its allegation that Climax failed to disclose material information to the Patent Office during the prosecution of the patents.  Molychem's *Walker Process* antitrust claim is predicated on the same allegation of fraud on the Patent Office.  Where an accused infringer has asserted a *Walker Process* counterclaim, a single trial may be more efficient use of judicial resources.  *See In re Theodor Groz & Sohne*, 1992 WL 188908, at *2.

The counterclaim defendants argue that a determination that the patents are valid and enforceable would obviate the need for the trial of Molychem's antitrust claims.  That argument would carry more weight had there been no prior adjudication of the patent issues.  This case is unusual because there has already been an evidentiary proceeding in the ITC.  The ITC's Opinion is not binding on this court, *see Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1568 (Fed. Cir. 1996), but it is relevant to the question of whether separate trials would be more efficient, convenient, and fair.

The ITC found that the '236 patent is unenforceable due to Climax's inequitable conduct. The ITC's Opinion states, "Climax's conduct constitutes a deliberate withholding of material information of the highest order . . . ."  (Opinion at 49-50).  If that conclusion is correct, then Molychem's antitrust claims will need to be tried.  In that case, bifurcation would result in duplication and inefficient use of judicial resources.  Although there is considerable overlap between the issues of inequitable conduct and the fraud necessary to establish a *Walker Process* antitrust claim, the elements are not identical.  The level of intent required to show inequitable conduct is not the same as the level of intent required to establish *Walker Process* fraud. *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069 (Fed. Cir. 1998).  Thus, if

-10-

Molychem were to prevail on its defense of inequitable conduct during a separate trial of the

patent issues, no issue preclusion would result from that determination.  A subsequent trial of

Molychem's *Walker Process* counterclaims would require another evidentiary presentation about

Climax's alleged fraud on the Patent Office.  Molychem would be forced to litigate the issue of

Climax's conduct during the prosecution of the patent for a third time.

In this case, a single trial of the patent and antitrust issues would promote the objectives

of efficiency and fairness.

### Defendant Molychem's second motion to compel discovery and Climax Molybdenum Company's and Phelps Dodge Corporation's Motion for Entry of Protective Order Staying Further Document Production Until Determination of Pending Motion to Dismiss and To Bifurcate and Stay Discovery

On May 26, 2005. Molychem served Climax with its first discovery request, seeking the

production of documents.  Climax produced some documents on July 27, 2005, but withheld

others as confidential and moved for the entry of a protective order.  On August 12, 2005, the

court entered the protective order requested by Climax.  Molychem disputed the scope of the

requested protective order, but that issue was resolved.

On October 11, 2005, Climax produced additional documents and again withheld some

documents.  On October 27, 2005, Molychem filed its second motion to compel discovery,

arguing that it is entitled to all the documents withheld by Climax.  Molychem also complains that

those documents produced by Climax were produced as a "jumbled, disorganized mass of

documents."  Molychem requests an order directing Climax to provide compete responses to

Molychem's discovery request and to organize and label the documents as required by Fed. R.

Civ. P. 34(b).

On November 1, 2005, Climax and Phelps Dodge moved for entry of a protective order relieving Climax of its obligation to respond fully to Molychem's request for production until the court has ruled on the pending motion to dismiss and motion to bifurcate.

The denial of the counterclaim defendants' motion to dismiss and their motion to bifurcate renders moot the counterclaim defendants' motion for protective order. A hearing is necessary on the question of whether Climax's method of production complies with Fed. R. Civ. P. 34(b).

Based on the foregoing, it is

ORDERED that the counterclaim defendants' motion to dismiss Molychem's third and fourth counterclaims and to dismiss Phelps Dodge as a party is denied; it is

FURTHER ORDERED that the counterclaim defendants' motion to bifurcate patent claims and antitrust counterclaims and to stay discovery on antitrust counterclaims is denied; it is

FURTHER ORDERED that Climax Molybdenum Company's and Phelps Dodge Corporation's motion for entry of protective order is moot; and it is

FURTHER ORDERED that a hearing on Molychem's second motion to compel discovery is set for December 14, 2005, at 2:00 P.M., in Courtroom A of the Byron White United States Courthouse, 18th and Stout Streets, Denver, Colorado. The date and time for a scheduling conference will also be set at that hearing.

Dated:  December 6th , 2005.   BY THE COURT:

s/Richard P. Matsch
_____
Richard P. Matsch, Senior District Judge