IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No.  02-cv-00311-RPM

CLIMAX MOLYBDENUM COMPANY,

      Plaintiff,

v.

MOLYCHEM, LLC,

      Defendant.

---

## FINDINGS, CONCLUSIONS AND ORDER

---

Molybdenum is a metallic element in the Periodic Table classification as Mo.  Mining its ore produces molybdenum disulfide ($MoS_2$) which is then processed to make products useful in industry.  After burning off the sulfer, making sulfuric acid, it is recrystallized as molybdic oxide (molybdenum trioxide) useful in steel making, and it may be chemically compounded as ammonium dimolybdate (ADM), a product useful as a catalyst for low sulfur fuel.  Climax mines molybdenum ore in Colorado and processes it at a plant in Fort Madison, Iowa.[1]  Molybdenum is mined in other countries, including China, Chile, Peru, Mexico, and Canada.

For many years, Climax produced another product, ammonium octamolybdate (AOM), useful as a smoke suppressant in the manufacture of polyvinyl chloride (PVC) insulation or jacketing of wires and cables required to meet fire safety standards for such installations as

---

[1]As used herein, "Climax" refers to Climax Molybdenum Company and its predecessor, Cyprus Amax Minerals Company.  Climax is a subsidiary of Phelps Dodge Corporation, which is a subsidiary of Freeport-McMoRan Copper & Gold Inc.

placement in a plenum, a closed space.  Before 1997, Climax made AOM by thermal

decomposition of ADM, heating it in a manner comparable to a pizza oven and then milling it to a

powder.  A primary customer for Climax AOM is AlphaGary Corporation.  It makes compounds

for sale to cable and wire manufacturers such as Lucent Technologies.  Cable and wire

manufacturers must have their products approved by the Underwriters Laboratories (UL).

    In 1986, D. K. Huggins, a research chemist at Climax, worked on a project to devise a

different method of preparing AOM.  In a memorandum written April 15, 1986, Huggins wrote

that the objective of the work he did for the predecessor to Climax was to devise a method for

preparing very fine AOM by an aqueous route.  Pl.'s Ex. 1.  The impetus for this experimentation

was the need for producing AOM in a small particle size.  Climax was pulverizing the powder

produced by the pizza ovens at substantial expense.  Additionally, it was difficult to control the

heat sufficiently to avoid contamination with molybdic oxide and ammonium trimolybdate (ATM).


    Huggins reported that he experimented with making AOM by an aqueous system using

several methods and unexpectedly encountered two compounds with the same empirical formula

but different structures as shown by X-ray powder diffraction (XRD).  He noted at least 19

different ammonium molybdate compounds listed in the JCPDS Powder Diffraction File and many

more reported in the literature, concluding that finding a good fit does not necessarily identify the

material.  *Id.* at CM0002430-31.  In his 1986 memorandum, Huggins said that what he called the

alpha form of AOM, made by digesting molybdic acid in an ADM solution and drying the

resulting solids at 110º C, was the same compound obtained by partial thermal decomposition of

ADM.  He said that another compound, which he called the beta form of AOM, was produced by

2

different methods.  Huggins cautioned that because the literature with regard to the existence and

identification of these two isomers was confusing, his rationale in identifying them had to be

explained and he did that after describing his methods of preparation.  *Id.* at CM0002432.

Huggins referred to a 1961 French patent, Robert, reporting alpha and beta isomeric forms of

ammonium tetramolybdate and said that they he thought they were actually octamolybdates.  *Id.*

at CM0002433-34.

Huggins obtained a patent for his methods of producing the compound he described as

"Ammonium Octamolybdate-Alpha," U.S. Patent No. 4,762,700 ('700 or Huggins) issued August

9, 1988.  Pl.'s Ex. 2.  The abstract of the '700 Patent reads as follows

> Ammonium octamolybdate-alpha is formed by reacting powdered molybdenum
> trioxide with a solution of ammonium dimolybdate in water at the boiling temperature
> until thickening of the slurry occurs, after which the slurry is digested, filtered hot and
> the separated precipitate is dried.

Claim 1, the only independent claim, reads as follows:

> The method for producing fine ammonium octamolybdate-alpha which
> comprises adding fine molybdic oxide to ammonium molybdate dissolved in an
> aqueous medium, said molybdic oxide being added to said ammonium molybdate
> solution in substantially a stoichiometric amount to form a slurry, heating said slurry
> at substantially the boiling temperature sufficient to provide substantial thickening
> thereof and then digesting the thickened slurry, filtering and drying the resulting fine
> ammonium octamolybdate-alpha of high purity.

'700 Patent, col. 4, ll. 7-16.  Huggins gave an example with a detailed description of his "wet

process."  *Id.*, col. 2, l. 63 – col. 3, l. 12.  The patent also said:

> Although the present invention has been described in conjunction with the
> preferred embodiments, it is to be understood that modifications and variations
> may be resorted to without departing from the spirit and scope of the invention, as
> those skilled in the art will readily understand.  Such modifications and variations
> are considered to be within the purview and scope of the invention and appended
> claims.

*Id.*, col. 3, l. 38 – col. 4, l. 5.

In 1994 Alpha Gary began to complain to Climax about the quality of its AOM.  Other customers also complained.  Climax began experimenting with "wet process" methods to improve its AOM.

Climax had not practiced the Huggins Patent.  It was filed away but a Climax employee in its marketing department found it in the files and brought it to the attention of Jack King, the chemical sales manager.  King called this patent to the attention of James Cole, then lab manager at the Plant, who with Steve Elder, the chief chemist, experimented with the Huggins wet process to produce AOM.

By January 1996, Climax was making wet AOM in its laboratory and supplying laboratory samples to customers, including AlphaGary.  Def.'s Exs. C-16 & C-17.  Climax kept AlphaGary apprised of its development efforts with respect to wet AOM.  Pl.'s Ex. 12.  When analysis by AlphaGary and another customer, Synergistics, indicated that AOM produced by the wet process appeared to be superior to dry AOM, Climax moved forward with efforts to produce wet AOM on a larger scale.  *See* Pl.'s Ex. 16 at FMI-002526; Def.'s Exs. C-21 & C-23.  In January 1997, Climax and AlphaGary entered into a confidentiality agreement.  Pl.'s Ex. 17.

As part of its product improvement efforts, Climax entered into a research contract with Iowa State University (ISU) in March, 1997 to compare the wet chemistry and dry thermal processes for production of AOM.  Pl.'s Ex. 19.  Dr. Robert McCarley directed the work at ISU.

Mohammed Kahn, the Climax Plant Manager, called a patent attorney, Jay Malkin, requesting his opinion of the scope of the Huggins patent.  In an opinion letter dated, March 19,

1997, Malkin wrote that it is reasonable to conclude that the Huggins patented process is primarily directed to the production of AOM-alpha but the "claim is fairly broad." Pl.'s Ex. 20.

By late March 1997, Climax had completed the construction of a pilot plant for the production of wet AOM at Fort Madison.[2] *See* Def.'s Ex. B-8. In April 1997, Climax began producing wet AOM at its pilot plant and sending production samples to AlphaGary for evaluation. Climax sent these trial samples at no charge.

During this time period, AlphaGary was continuing to purchase dry AOM from Climax. Climax's practice with respect to dry AOM was to ship it by truck to AlphaGary's plant in Leominster, Massachusetts. Dry AOM was packed in 50 pound bags, with approximately 40,000 pounds constituting a truckload. The usual time for Climax's trucks to travel from Fort Madison, Iowa to Leominster, Massachusetts is two days. Because of the problems with the Climax dry AOM, AlphaGary had required Climax to provide pre-shipment samples before delivering AOM to the AlphaGary facility in Massachusetts. Such pre-shipment samples were sent by Federal Express, addressed to the attention of Roger Parenteau at AlphaGary. Def.'s Ex. C-10. Parenteau was the director of purchasing for AlphaGary.

A memo from King to Mo Kahn dated May 1, 1997, shows that by that date AlphaGary had made compounds using samples of Climax's wet AOM and had sent those compounds to Lucent Technologies, an AlphaGary customer, for approval. Def.'s Ex. B-10. King's memo stated that AlphaGary did not want any additional trial samples of wet AOM. The memo further stated that if the results from Lucent were as expected, AlphaGary intended to convert entirely to

---

[2]The terms "wet" and "dry" AOM refer to the processing methods. The AOM that is sold is a dry product.

wet AOM.  King wrote, "They [AlphaGary] are expecting homogenized wet chemical AOM based on our conversations."  The memo also addressed an issue regarding packaging.  King testified that AlphaGary preferred 50 pound bags, but wet AOM is less dense than dry AOM, and the same weight of wet AOM would not fit in the normal bags used to hold 50 pounds of dry AOM.

The question regarding the bag size was resolved by May 22, 1997, when King and a Climax regional sales manager visited AlphaGary.  A letter from King to Parenteau dated June 3, 1997, stated, "As we discussed during the May 22, 1997, visit that Bob Toma and I made to Alpha Gary Corporation, our standard package for wet chemical AOM shall be 25 pounds net of AOM in the normal paper sack."  Def.'s Ex. B-13.

On June 2, 1997, Climax sent a small sample of wet AOM to AlphaGary by Federal Express.  The sample was from lot number WAO21B, a designation indicating wet AOM.  This event is reflected in a fax transmission from Daniel Vogel of Climax to Jim Stocking of AlphaGary, conveying the sender's copy of the FedEx receipt.  Def.'s Ex. B-11.  On June 2, 1997, Vogel sent another fax transmission to Parenteau, informing Parenteau that the sample had been sent to Stocking via Federal Express.  Def.'s Ex. B-12.  Cole made handwritten notations on the fax cover sheet (Ex. B-12) indicating that the sample was delivered to AlphaGary on June 3, 1997.

An email dated June 4, 1997, from Cole to other Climax employees describes Cole's conversation with Tony Sansone on that day.  Pl.'s Ex. 35.  Sansone was a chemist who headed AlphaGary's research and development department.  The email shows that Cole and Sansone had discussed an anticipated shipment of 10,000 pounds of wet AOM.  Cole's email stated that

6

Sansone had expressed a concern about proper identification of the 10,000 pounds.  Cole told

Sansone that the wet AOM has a unique lot number and each bag would be identified as

containing 25 pounds.  In response to Sansone's concerns about identification, Cole agreed that

Climax would affix a label marked "EVAL" on each pallet of the wet AOM.  Cole's email

referred to the wet AOM sample sent to AlphaGary on June 2, 1997, as a "pre-shipment sample."

Cole's email indicated that on June 4, 1997, Climax was awaiting AlphaGary's approval of the

pre-shipment sample of wet AOM.  The email concluded, "Note: Tony had not seen the results of

the sample, but was going to look into. [sic] Additionally, I had planned to call Jim

Stocking/Roger Parenteau tomorrow."

A document produced by AlphaGary shows that AlphaGary did receive the sample on

June 3, 1997, tested it and deemed it acceptable.  Ex. RX-56.[3]

A letter dated June 10, 1997, from Cole to Sansone stated, "Order 6914-5 is scheduled to

ship June 11.  Included in the shipment are 400 bags (10 pallets) of WAO21B, wet chemical

AOM."  Exs. CX-128C; CX-176C; RX-39C; RX-57C.[4]  Cole's letter also explained that the wet

AOM could be differentiated from "standard Wyssmont AOM" (i.e., dry AOM) by lot number,

bag weight, and the pallet stickers.  Cole's letter requested that he be advised of the material's

delivery and segregation.

---

[3]Climax and Molychem stipulated to the admission of the evidence from *In the Matter of Certain Ammonium Octamolydate Isomsers*, Inv. No. 337-TA-477 (the ITC proceeding) as evidence in this record.  Exhibits from the ITC record are designated by CX or RX.

[4]The ITC record includes multiple copies of this letter.  Two exhibits (CX-176C and RX-57C) have a handwritten notation, apparently made by Sansone, stating "Note:  R & D to coordinate this evaluation."

The reference in Cole's letter to Order 6914-5, comes from a Climax document bearing the caption "Order Entry Program MSAS." Def.'s Ex. B-9. King testified that the document relates to an order taken on April 24, 1997, the date shown on the upper right corner. King identified handwriting on the document as that of Beverly Diffendal, the Climax employee who recorded the order. The order was designated as "6914-5." King explained that the "5" signifies that this order relates to the fifth shipment in a series of shipments under order number 6914. Handwritten notations on the line for "date of delivery or shipment" indicate that this shipment was originally scheduled for delivery to AlphaGary on June 11, 1997, with a shipment date of June 9, 1997. The weight of 40,000 pounds was recorded in black ink. The amount written in line for price was $4.13 per pound. A blue ink notation modified the 40,000 to 30,000. Another blue ink notation under "variable instructions" appears to state: "10,000# wet chemical (get lot # from Jack)." That statement is crossed out in black ink, and another handwritten notation (in black ink) states, "10,000# wet chem. all @ 4.13/# per JK 6/10." A notation (in red ink) reads: "Lot WAO21B." That lot number corresponds with the lot number of the preshipment sample of wet AOM which Vogel sent to AlphaGary on June 2, 1997. King explained that a red stamp in the upper right hand corner, with "6/10" handwritten in the box, indicates that the order was released on June 10, 1997. King testified that this stamp shows that Climax's credit department approved the release of the order and that such approval was required before materials could be shipped to a customer.

On June 11, 1997, Climax shipped a truckload of AOM to AlphaGary – 30,000 pounds of dry and 10,000 pounds of wet AOM. Climax generated an invoice for this order on June 11,

1997.  Def.'s Ex. B-18.  AlphaGary received the shipment and paid for it.  AlphaGary ordered only wet AOM product after July 1997.

As set forth above, Dr. Robert McCarley of Iowa State University was directing a project to study AOM production, pursuant to a contract with Climax.  McCarley produced progress reports to Climax, including spectrographs from samples tested by Xray Diffraction (XRD) and Raman Spectrograph machines.

Cole had sent the Huggins Patent to McCarley who followed the process described in its example.  He wrote a report of the results on June 17, 1997 and an experiment varying that process on July 2, 1997.  McCarley concluded that the Huggins patent process produced a mixture of alpha ($\alpha$) and beta ($\beta$) AOM with the ratio changing with the variations.  Pl.'s Ex. 43.

In September, McCarley reported that his testing of production samples from the Climax plant using the wet process indicated that the product was "a new isopolymolybdate material; probably an octamolybdate (referred to as X-AOM)."  Pl.'s Ex. 46 at CM000488.  He also conducted experiments with the Huggins patent procedure and wrote:

> Raman characterization showed that as the $MoO_3$ and ADM react, $\beta$-AOM is formed as an intermediate phase which is then rapidly converted to $\alpha$-AOM.  Partial conversion to X-AOM occurred as the slurry started to thicken and became white in color.  Mixtures of $\alpha$-AOM and X-AOM were always thus obtained.

*Id.* at CM000489.

From the testing done by Climax in 1996, Cole believed that the Huggins patent made fine alpha AOM based on XRD testing results he obtained from an outside lab.  Cole had no knowledge of Raman spectrometry before seeing McCarley's reports.  Cole and McCarley

discussed these reports.  Cole understood that McCarley was using X to indicate that the substance identified was unknown to him.

McCarley submitted a third report, dated October 10, 1997, informing Climax that after testing the plant product and conducting experiments with the Huggins patent example, with some variations, he concluded that the Climax wet chemistry process showed that β-AOM was formed initially, followed by production of α-AOM and then finally the new X-AOM phase.  Pl.'s Ex. 48. He attached, as Figure 9 to the report, a Raman spectrograph demonstrating this conclusion by peaks appearing differently at heating times from 45 to 230 minutes.  *Id.* at CM0001284.

On November 7, 1997, McCarley reported that he attempted to grow single crystals of what he referred to as "X-AOM" without success, and said that this X-AOM phase represents a new and interesting material in "the molybdenum isopolymolybdate family of compounds."  Pl.'s Ex. 49 at CM0002236.  Cole terminated the ISU contract on November 21, 1997.  Pl.'s Ex. 50.

Kahn faxed the September McCarley report to Malkin who understood that McCarley was seeing something new and mysterious but Malkin did not know what could be claimed as patentable.  After receiving McCarley's October report, Malkin visited the Fort Madison pilot plant where he met Kahn and Cole and reviewed the wet manufacturing process.

Elder had no experience with Raman spectroscopy before reading the McCarley report. Elder sent samples of the pizza oven and wet process AOM products to an outside lab, NAMAR Scientific, Inc., for Raman spectra comparison and received a report, dated November 11, 1997. Pl.'s Ex. 59.1.  Cole sent these results to Malkin.  Elder wrote a note to Malkin, comparing the ISU spectra results and the NAMAR spectra results and suggested to Malkin that from the four peaks of 955 cm$^{-1}$, 348 cm$^{-1}$, 865 cm$^{-1}$, and 798 cm$^{-1}$, which McCarley found as the X-phase of

the wet process, and the peaks of 953 cm$^{-1}$, 946 cm$^{-1}$ and 798 cm$^{-1}$, found by NAMAR, a range of three peaks, 953-55 cm$^{-1}$, 946-48 cm$^{-1}$, 796-798 cm$^{-1}$, could be used to identify the product produced.  Pl.'s Ex. 59.

On June 9, 1998, Malkin filed an application for a patent, titled Novel Ammonium Octamolydate Composition and Method For Producing the Same.  Pl.'s Ex. 60 at 149 – 220.  In the recitals of the background of the invention, Malkin described the use of α-AOM as a smoke suppressant in polymeric plastic coating materials and its preparation by thermal decomposition and referred to the '700 Patent's notations regarding the disadvantages of that process.  He then wrote that a wet reaction process was developed as extensively discussed in the Huggins patent, which he incorporated by reference, and informed the PTO that the '700 patent combined materials in the proportions shown in the following basic formula:  $2(NH_4)_2Mo_2O_7 + 4MoO_3 \rightarrow \alpha\text{-}(NH_4)_4Mo_8O_{26}$, described as ammonium octamolybdate.  Malkin asserted that the claimed invention was a unique isomer (X-AOM) different from other isomers of AOM "both structurally and functionally."  Pl.'s Ex. 60 at 152.  Malkin wrote that this product is characterized and distinguished from other AOM isomers by Raman spectral analysis and that X-AOM is produced using a unique manufacturing process.  *Id.*

The application contained 19 claims, the first of which is for the product identified as:

An ammonium octamolybdate isomer having Raman spectra peaks at wavelength values of about 953 – 955 cm$^{-1}$, about 946 – 948 cm$^{-1}$, and about 796 – 798$^{-1}$.

Pl.'s Ex. 60 at 199.

Claim 2 was a method claim for producing an ammonium octamolydate isomer . . . ."  Claims 3 through 5 were dependent claims with variations of claim 2.  Claim 6 was an

independent method claim for producing an unspecified ammonium octamolydate isomer with variations in dependent claims 7 and 8.  Claims 9, 12, 18 and 19 were also independent method claims, all for producing an unspecified isomer of ammonium octamolybdate.

Mohamed H. Kahn, James A. Cole, Timothy G. Bruhl, Wendell S. Elder, Gary A. Glasgow and Vijaykumer M. Wagh, all employees of Climax, were named as co-inventors. McCarley was not named and he was not informed that his work was being used in an application for a patent.  The contributions of Bruhl, Glasgow and Wagh are not disclosed in the trial record. There is nothing in the record to support a finding that any of these co-inventors had sufficient qualifications to conduct Raman spectrography or to interpret the results.

The PTO examiner rejected all of the claims in a first office action dated March 1, 1999. Pl.'s Ex. 60 at 233-39.  Claims 2-19 were rejected under 35 U.S.C. § 112, second paragraph, as indefinite.  Claims 1-19 were rejected for obviousness under 35 U.S.C. § 103 over U.S. Patent 4,762,700 to Huggins in view of U.S. Patent No. 4,079,116 to Ronzio *et al.*  As to claim 1, the examiner stated:

> Regarding claim 1, while Huggins does not specifically recite the Raman spectra peaks at a [sic] specific wavelengths, as recited by applicants, for his isomers, it would be expected that the isomers of Huggins would be the same, because the product was made in the same manner.

Pl.'s Ex. 60 at 238.

Malkin was not surprised by this office action.  On April 12, 1999, he wrote a letter to Kahn, explaining the examiner's position and included this paragraph:

> **The most important claim (in our opinion) is composition claim 1 which is the sole product claim.**  Claim 1 simply covers the X-AOM product regardless of how it is made.  When we originally prepared this case (and this may still be the situation at the current time), the exact mechanism and procedural steps

which resulted in the production of X-AOM were not known with certainty. Thus, we submitted claims which covered all of the possible method steps that were considered (at the time of filing) to have a possible influence on the preferential manufacture of X-AOM. Perhaps it may be useful at this time to reconsider the method claims listed above (Claims 2, 6, 9, 12, 17, 18, and 19) to determine whether the processes covered by these claims are of continued technical importance in the production of X-AOM. If not, we should possibly consider cancelling some of them in order to more appropriately focus on independent Claim 1. After you have reviewed the present letter, please give me a call to discuss this issue.

Pl.'s Ex. 68 at FMI-009392.65-66.

Malkin made this recommendation:

Our recommendation regarding Claim 1 is as follows: If possible, the exact process recited in Huggins should be reproduced in your laboratories, followed by Raman spectral analysis of the resulting product. This data should be submitted to the U.S. Patent and Trademark Office in the form of a Declaration to be signed by you and/or the individual(s) that conducted/supervised the tests. In this manner, we can show the Examiner that the Huggins process would not yield an X-AOM composition.

*Id.* at FMI-0093932.66.

Kahn referred Malkin's letter to Cole. No one at Climax took any action to comply with the recommendation. Cole concluded that because McCarley had performed an exact reproduction of the Huggins process it was not necessary for Climax to do it again in a laboratory. Cole accepted McCarley's work but rejected McCarley's interpretations of the Raman spectra obtained. Cole had no ability to interpret Raman spectrographs and no qualifications as a chemist. His disagreement was based solely on the use of the three peaks in claim 1 as definitive of the claimed product and none of the figures in McCarley's reports showed those three peak ranges. Cole disregarded the four peaks from McCarley's October report resulting from continuing the Huggins heating process beyond the three hours described in the example. The selection of the three peaks was arbitrary. No one from Climax contacted McCarley or anyone

13

else at ISU to obtain any additional information to be used to show the Examiner that the Huggins process would not yield the claimed composition.

Climax changed lawyers.  Bruce Dahl, who had been with the same law firm as Malkin, took over the prosecution of the patent application in May, 1999.

Dahl discussed the office action rejection with Malkin.  They agreed that the chances of obtaining any patent would be enhanced by separating the product from the process.  Malkin said that the examiner's objections to claim 1 could be overcome by submitting data showing that the Huggins process produced $\alpha$-AOM and not X-AOM while the process described in the application produces X-AOM and not $\alpha$-AOM.

Dahl received assurance from Cole that ISU had followed the Huggins process and produced $\alpha$-AOM as shown in the McCarley report.  Dahl reviewed McCarley's reports.  Like Cole, Dahl rejected McCarley's conclusions and prepared a declaration for Cole to sign, attaching Fig. 9 from McCarley's reports but without McCarley's notations.  Cole signed the declaration, swearing that ISU had shown that the Huggins process produced $\beta$-AOM as an intermediate phase during the heating and then $\alpha$-AOM began to dominate after 25 minutes with $\beta$-AOM disappearing by 30 minutes and the spectra essentially unchanged for the remainder of the time – up to 230 minutes.  Cole acknowledged "a small spectral peak at about wavenumbers 797-798 cm$^{-1}$ at time t = 170 minutes and again at t = 230 minutes", but emphasized that "the Raman spectral data do not show the existence of any spectral peaks at the other claimed wavenumber values, i.e., 953-955 cm$^{-1}$ and 946-948 cm$^{-1}$."  Pl.'s Ex. 60 at 251.  Cole declared that in contrast to the data that he submitted as that produced by the Huggins patent process in Exhibit B, the "Raman spectra derived from the AOM samples prepared according to the processes disclosed in

the present application" clearly show the peaks in claim 1.  Pl.'s Ex. 60 at 251.  He did not identify which of the processes among the 19 method claims in the original application produced that data.

The examiner accepted the amendment, concluding that "while ammonium octamolybdate is known in the art, but [sic] the particular ammonium octamolybdate having specific raman spectra wavelength as recited in claim 1 distinguishes over the prior art."  *Id.* at 264.

The examiner was deceived.  Climax told the PTO that its process produces X-AOM and that X-AOM is new – conclusions drawn from McCarley's reports –  but the Cole declaration omitted McCarley's conclusion that the Huggins method produces mixtures of α-AOM and X-AOM.  The examiner was not informed of McCarley's conclusions in the October report that the Huggins process appeared to be making an unknown polymolybdate and that the product changes as the chemical reaction progressed with heating over time.  Cole reinterpreted McCarley's data, without the expertise to do so, and misrepresented the conclusion set forth in the narrative portion of McCarley's report.  As noted earlier, McCarley's Figure 9 was changed to remove his notations showing the formation of X-AOM.

The deception was deliberate and contrived.  It was made possible by the clever construction of claim 1, by separating the product claim from the process claims, and selective use of McCarley's report.  As he had written in his letter of April 12, 1999, explaining the examiner's rejection, because the process that resulted in the production of X-AOM was not known with certainty, Malkin had claimed all of the possible method steps that were considered to have a possible influence on the production of X-AOM.  Cole had no better knowledge than Malkin when Cole signed the declaration supporting the amended application.  In fact, McCarley testified

that he did not know what he had produced in his work and wanted to continue his work.  Climax refused to permit him to do so and canceled the ISU contract.  Climax did not want more information.

The chemistry of polymolybdates is both complex and simple.  The complexity is in measuring and defining differences that are sufficient to warrant identification of isomers that can be characterized as compounds.  That was shown in the Tytko article, discussed *infra*, and in the testimony of Dr. Uy and Dr. McCalady.  It is simple in that it depends upon chemical reaction of mixed elements heated over time – i.e. cooking.

 In defense of the ‘236 Patent, Climax has emphasized the time of heating described in the example given in the Huggins patent and argues that the formation of X-AOM requires heating beyond that time.  That argument is flawed because it is based on a too narrow interpretation of the Huggins Patent drawn from the example.  The language of the Huggins claims does not limit the duration of the heating to three hours.

Climax sought to distinguish its claimed X-AOM isomer from the alpha isomer of Huggins by emphasizing the differences in the processing.  The ingredients in the mixture are the same.  The asserted differences are the gradual mixing of those ingredients by Climax versus the instantaneous mixing in Huggins, the size of the particles placed in the mix and the heating times.

Yet, Climax withdrew the process claims from its patent application to avoid the obviousness objection of the examiner and relied on its product definition of an isomer identified by three Raman spectral peaks to persuade the examiner that this isomer was different from the Huggins patent process.

16

What was material, if not critical to this contention was the question of whether the Huggins method claim would produce the Kahn product.  That is why Malkin recommended to Cole that the Huggins procedure given as an example in his patent be followed exactly as written and new Raman spectral data be obtained and analyzed.

Molychem's expert witness, O. Manuel Uy did just that and he was the only who did it. He testified that he followed the Huggins example nine times in the fall of 2006 and each time obtained at least two of the Kahn peaks at 3 hours of heating, which he interpreted as mixtures of alpha and X-AOM, in agreement with McCarley's report.  Def.'s Ex. H-18.  Uy testified that one of the X-AOM peaks began to form much earlier, as McCarley had shown in his report.  Uy testified that with additional time, the Huggins method produced the three peaks of X-AOM, as the final product.

The question raised by the office action was whether the Kahn product could be produced by the Huggins process as described in claim 1 of the '700 Patent.  Uy demonstrated that it could by variations of the example and confirmed what McCarley was suspecting, but concluded that McCarley was mistaken in his belief that the resulting isomer was a new and different polymolybdate.

In 1975 two German professors published a research paper surveying the scientific literature then available concerning "polymolybdates which can be produced from acidified aqueous solutions" to detect all of the possible solid products from chemical systems, including $(NH_4)_2O\text{-}MoO_3\text{-}H_2O$ and characterize them on the basis of Raman spectra.  Def.'s Ex. A-15, at CM0002375.  Their published work is identified as the Tytko article and was available to research chemists.  The Raman spectrographs published with that article include one which shows the three

peaks of the Kahn patent with a chemical formula that Uy said is the same as $(NH_4)_4Mo_3O_{26}$, ammonium octamolybdate.  Uy concluded that this was the compound Climax claimed to be X-AOM.

The Tytko article was not a prior art reference in the Kahn patent application.

The evidence in this case is that the definition of a compound claimed to be a newly discovered isomer of ammonium octamolybdate was only a description of a substance that existed and was known to research chemists at least as early as 1975.  The Kahn patent was obtained by an artifice in giving a new description to an old product.

The Kahn patent issued on November 16, 1999.

Molychem obtained AOM from Anhui, a chemical plant in China, and sold it to Gitto Global in the United States in March, 2001.  Molychem sold 50 kg of Chinese produced AOM to AlphaGary Corporation on August 30, 2001.  Pl.'s Ex. 101.  The Anhui AOM was tested and produced Raman spectral peaks matching the Kahn patent and the product sold by Climax.  The process by which Anhui made its AOM is not disclosed in the record and there is no evidence that anyone at Anhui had any knowledge or information about the wet process used in the Fort Madison plant.

On February 15, 2002, Dahl sent a letter to William Thiede, the manager of Molychem, with a copy of the complaint filed that day in this case, advising that the complaint would not be served if the dispute could be resolved without litigation and asking for a response by March 11, 2002.  Thiede was shocked to see the complaint, contacted counsel and asked to meet with Climax officials.  At a meeting in Phoenix, with Climax officials, Thiede acknowledged small sales of AOM and agreed to pay Molychem's profits to Climax with an agreement to stop sales.  The

Climax officials rejected the offer, demanding $1 million for damages and told Thiede the damages would be tripled because the infringement was willful.  Molychem could not pay that amount and this lawsuit proceeded.

On August 20, 2002, Climax filed a complaint with the United States International Trade Commission (ITC) claiming that Molychem violated section 337 of the Tariff Act, 15 U.S.C. § 1337, by its importation of AOM infringing the '236 Patent.  In that proceeding, designated *In the Matter of Certain Ammonium Octamolydate Isomsers*, Inv. No. 337-TA-477, Molychem asserted that the '236 Patent is invalid and unenforceable.  On October 10, 2002, this action was stayed pursuant to 28 U.S.C. § 1659(a), pending the outcome of the ITC proceeding.

An evidentiary hearing was held before an Administrative Law Judge (ALJ) in February 2003.  On May 15, 2003, the ALJ issued an Initial Determination, concluding that Molychem's product infringed claim 1 of the '236 patent, but finding no violation of § 337, based on the determination that the claim is invalid under the on-sale bar provision of 35 U.S.C. § 102(b).  The ALJ rejected Molychem's other arguments, including arguments that the '236 Patent is anticipated by Huggins, anticipated by Tytko, and unenforceable due to inequitable conduct.

Climax petitioned for review of the ALJ's Initial Determination, which was opposed by Molychem and the Commission's investigative attorney.  The Commission determined that it would review the Initial Determination in its entirety and requested that the parties address three specific questions:  (1) the meaning of the term "octamolybdate", (2) the teachings of the Tytko article, and (3) the legal principles and evidence pertaining to the existence or non-existence of an offer for sale before the critical date.

After the ALJ's invalidity decision, Arthur Fox of Molychem wrote to AlphaGary, notifying it of that decision and offering to supply its requirements by resumed importing of AOM from China. Def.'s Ex. E-15. By letters of June 13, 2003, drafted by the legal department of the parent corporation of Climax, Phelps Dodge Corporation, Jack King informed AlphaGary that Fox was wrong, that the ALJ's decision was wrong, and that a final decision of the ITC was expected in August and that even if it affirmed the ALJ's determination, it would only mean that importation would not be banned but the '236 Patent remains valid and selling or using the Molychem's X-AOM would be an act of infringement. Def.'s Ex. E-16.

On August 20, 2003, the Commission issued notice of its final determination of no violation of section 337. In a fifty-seven page opinion dated August 28, 2003, the Commission set out the reasons for that determination. With respect to infringement, the Commission stated that it would affirm the ALJ's conclusions that the accused product infringes the sole claim of the '236 patent, if the patent is valid and enforceable. With respect to validity, the Commission agreed with the ALJ's findings and conclusions that the '236 Patent is invalid under 35 U.S.C. § 102(b) because of an on-sale bar, and also concluded that the '236 Patent is invalid under § 102(b) due to anticipation by the Tytko article and anticipation by the Huggins patent. Finally, the Commission found that Climax had engaged in inequitable conduct during the prosecution of the '236 Patent, rendering it unenforceable.

Climax appealed the ITC Determination to the United States Court of Appeals for the Federal Circuit, but dismissed the appeal. The stay of this action was dissolved on December 18, 2003.

Molychem did not make any sales of AOM after this action was filed.  Molychem filed a counterclaim charging Climax with a violation of Section 2 of the Sherman Act, seeking damages under the Clayton Act.

Manufacturers of PVC wire and cable buy compounds containing AOM to be included in the ingredients for their products that meet safety standards for plenum installations because it is useful as a smoke suppressant.  The AOM may be less than 5% of the total ingredients in the compound.

The relevant product market for AOM is described as Low Smoke Polyvinyl Plenum Cable (LS PVC) compounds.  AlphaGary has about 60% of that market.  Teknor Apex Company has an estimated 30% market share and there are perhaps as many as 20 other compounders.  AlphaGary switched from the pizza oven process dry AOM supplied by Climax to the wet process in 1997.  Climax continues to make and sell dry AOM to compounders who find it acceptable, including Teknor Apex Company.  Climax has charged wet and dry AOM at the same price.

There are products that wire and cable makers use for their plenum cables that are not PVC.  FEP made by DuPont and 3M is such a product which has a higher cost but may have a longer useful life, saving replacement costs.

Molychem claims $525,000 as damages based on its contentions that it would have made that amount as profit from sales it could have made to AlphaGary of Chinese AOM from September, 2001 to June, 2003 when the world price for molybdenum increased substantially.  Molychem's estimate of lost sales is based on the assumption that it would have made one-half the sales of Climax to AlphaGary during that period.

The '236 Patent is Invalid

The sole claim of the '236 Patent fails to meet the essential requirement for patentability under 35 U.S.C. § 101 that it is a new and useful composition of matter or a new and useful improvement thereof. The claimed elements of the three Raman spectral peaks of an ammonium octamolybdate isomer is novel only in that it is a different way to describe a chemical compound that has been known since 1975 and is a product produced by its own patent, the Huggins patent, issued in 1988. Although Huggins claims a process for producing alpha, carried to completion of the reaction, X-AOM is made. That was established by the unrefuted testimony of Uy. Whether Uy is correct in concluding that X-AOM is actually beta may be disputed. What the totality of the evidence shows, clearly and convincingly, is that X-AOM was not a new and novel compound as Climax claimed. Climax's own expert, Dr. Macalady testified that when one mixes the ingredients in the Huggins patent, there is a tendency to form X-AOM, if there is any variation from the Huggins example. ITC Tr. at 1204:23 – 1205:14. Claim 1 of the Huggins patent, the broadest claim, is not limited to the example. "Absent some clear intent to the contrary, [the Federal Circuit] does not import examples from the specification into the claims." *In re Omeprazole Patent Litig.*, 483 F.3d 1364, 1372 (Fed. Cir. 2007).

The fact that the Huggins patent does not expressly disclose the production of X-AOM does not matter.[5] A newly appreciated property of a known process is not patentable. *See Atlas Powder Co. v. IRECO Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999) ("[T]he discovery of a previously unappreciated property of a prior art composition, or scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer."); *see also Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1376 (Fed. Cir.

---

[5]The XRD analysis described in Huggins would not detect small amounts of X-AOM.

2001) ("Newly discovered results of known processes directed to the same purpose are not patentable because those results are inherent."). The initial decision of the PTO examiner was correct. The ITC was also correct that the '236 Patent is invalid under 35 U.S.C. § 102(b) because of anticipation by the Tytko article and by the Huggins patent.

Issuance of the patent was also barred under § 102(b) because the claimed compound was on sale in the United States more than one year prior to the date of the application for patent. For the on-sale bar to apply, two conditions must have occurred before the "critical date," that is, the date that precedes the application date by one year. First, it must be shown that the product was the subject of a commercial offer for sale, and second, that the invention was ready for patenting. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998). To prevail on an on-sale bar defense, an accused infringer must demonstrate by clear and convincing evidence that both conditions occurred before the critical date. *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1045-46 (Fed. Cir. 2001).

The critical date in this case is June 9, 1997. Climax does not dispute that an actual sale of 10,000 pounds of wet AOM occurred on June 10, 1997. On June 11, 1997, Climax shipped 10,000 pounds of wet-AOM to Alpha Gary, as evidenced by a Climax invoice bearing that date. Def.'s Ex. B-18. The issue is whether this transaction resulted from a commercial offer to sell wet AOM that was extended by Climax before the critical date.

"[T]he question of whether an invention is the subject of a commercial offer for sale is a matter of Federal Circuit law, to be analyzed under the law of contracts as generally understood." *Group One, Ltd.*, 254 F.3d at 1047. The Federal Circuit generally looks to the Uniform Commercial Code to define whether a communication or series of communication rises to the

level of a commercial offer. *Id.* The Federal Circuit has employed the following definition of "offer": "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001) (quoting Restatement (Second) of Contracts § 24 (1981)). "[F]or an offer to exist, it must constitute a manifestation communicated to the offeree so as to justify his understanding that by assenting a bargain will be concluded." *Linear Tech. Corp.*, 275 F.3d at 1050 (quoting Richard A. Lord, Williston on Contracts § 4:13, at 367 (4th ed.1990)).

Molychem asserts that Climax made a commercial offer to sell wet AOM at least by June 2, 1997, when it sent a sample of wet AOM to AlphaGary, and AlphaGary's approval of the sample was all that was necessary to conclude the bargain. Climax disputes that any offer to sell was extended before the critical date, arguing that essential terms were not defined until June 10, 1997. Climax characterizes the June 11 shipment as its acceptance of AlphaGary's offer to buy wet AOM.

This chronology of Climax's dealings with AlphaGary with respect to dry and wet AOM leads to the conclusion that before the critical date Climax made a commercial offer to sell wet AOM. The Cole email dated June 4, 1997, shows that by that date both AlphaGary and Climax anticipated that upon AlphaGary's approval of the June 2 sample, Climax would ship 10,000 pounds of wet AOM, packaged in the normal bag, with 25 pounds of wet AOM in each bag. The reference in Cole's email to the sample as a "pre-shipment sample" is consistent with the course of dealing they had established with respect to dry AOM. Vogel's email dated June 2, 1997, to Parenteau, is also consistent with that established practice. *Compare* Def.'s Exs. C-10 and B-12.

Practices with respect to shipping and delivery, credit, and payment were in already in place, as shown by the Climax order form, Defendant's Exhibit B-9.

Climax contends AlphaGary was the offeror, and Climax did not accept AlphaGary's offer to buy until June 10, 1997.  Climax's characterization of the transaction is disingenuous.  The handwritten notations on the Climax order form do not disprove an offer to sell before the critical date.  That handwriting shows only that Climax documented terms of the wet AOM sale on its internal paperwork on or about June 10, 1997.  Notably, when it did so, the quantity was 10,000 pounds – the same quantity stated in Cole's email dated June 4,1997, and all other terms were the same as those that applied to dry AOM.  The only difference was the amount of wet AOM packed in each bag.  That matter had been decided on May 22, 1997.

Cole's and King's testimony about their communications with AlpaGary during late May and the first week in June 1997, is most notable for what they don't remember.  Cole's June 4 email documented his plans to call Stocking and Parenteau the next day, but Cole testified that he could not remember having any other communications with anyone at AlphaGary until June 10, 1997.  That testimony strains belief, in light of the importance of this transaction to Climax.

The anticipated shipment of 10,000 pounds of wet AOM represented the culmination of eighteen months of work and an investment of more than $1 million, the price of building the pilot plant.  Similarly troubling is the vagueness of King's recollection about communications with AlphaGary leading up to the June 10 sale.  The relationship with AlphaGary and its satisfaction with the Climax wet AOM product was so important that King and Toma had personally visited AlphaGary on May 22, 1997.  Significantly, King's letter dated June 3, 1997, addressed only the packaging of wet AOM.  The inference to be drawn is that there were no other issues to be

resolved, and that when Climax sent the preshipment sample on June 2, 1997, AlphaGary's

approval was all that was necessary to conclude the bargain.

The record is unclear as to when AlphaGary communicated its approval of the sample

from lot WAO21B, but the exact date does not matter.  The evidence is clear and convincing that

before June 9, 1997, Climax had manifested a willingness to sell 10,000 pounds of wet AOM to

AlphaGary.

Climax argues that there was no *commercial* offer, characterizing the June 1997

transaction as relating to experimental use.  The evidence does not support Climax's description

of the transaction.

"[A] sale that is primarily for experimental purposes, as opposed to commercial

exploitation, does not raise an on sale bar."  *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336,

1354 (Fed. Cir. 2002) (quoting *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 550

(Fed. Cir. 1990)).  The assessment of experimental use requires consideration of a number of

factors, including:

> (1) the necessity for public testing, (2) the amount of control over the experiment
> retained by the inventor, (3) the nature of the invention, (4) the length of the test
> period, (5) whether payment was made, (6) whether there was a secrecy
> obligation, (7) whether records of the experiment were kept, (8) who conducted
> the experiment, ... (9) the degree of commercial exploitation during testing[,] ...
> (10) whether the invention reasonably requires evaluation under actual conditions
> of use, (11) whether testing was systematically performed, (12) whether the
> inventor continually monitored the invention during testing, and (13) the nature of
> contacts made with potential customers.

*Allen Eng'g*, 299 F.3d at 1353 (quoting *EZ Dock v. Schafer Sys., Inc.*, 276 F.3d 1347, 1357

(Fed.Cir. 2002) (Linn, J., concurring)).  "This list is not exhaustive, and all of the experimentation

factors may not apply in a particular case."  *Electromotive Div. of Gen. Motors Corp. v. Transp.*

*Sys. Div. of Gen. Elec. Co.*, 417 F.3d 1203, 1213 (Fed. Cir. 2005).  "[T]he question posed by the experimental use doctrine . . is whether the transaction constituting the sale was 'not incidental to the primary purpose of experimentation,' i.e., whether the primary purpose of the inventor at the time of the sale, as determined from an objective evaluation of the facts surrounding the transaction, was to conduct experimentation."  *Allen Eng'g*, 299 F.3d at 1354 (quoting *EZ Dock*, 276 F.3d at 1357 (Linn, J., concurring)).  Experimentation conducted to determine whether a product would suit a particular customer's purposes does not fall within the experimental use exception.  *Allen Eng'g,* 299 F.3d at 1355.

AlphaGary's testing of the June 2 pre-shipment sample was done without any control or participation by Climax.  Cole testified that the 10,000 pounds of wet AOM was sent for incorporation into AlphaGary's products, and the purpose of the "EVAL" label was to ensure that the X-AOM would be used in product lines that were not as "critical" or products that did not require large concentrations of X-AOM.  ITC Tr. at 214, 497-98.  Any further evaluation or tracking of the product's performance was done by AlphaGary, not Climax.  There is no evidence that Climax retained any control or participated in any testing of the 10,000 pounds of wet AOM after it was delivered to AlphaGary.  The lack of control by Climax with respect to any further evaluation is significant.  *See Electromotive Div.*, 417 F.3d at 214-15 (concluding that control and customer awareness ordinarily must be proven if experimentation is to be found).  The circumstances leading to and surrounding the June 1997 sale compel the conclusion that Climax's primary purpose was commercial exploitation when it offered and sold 10,000 pounds of wet AOM to AlphaGary.  Neither the existence of a confidentiality agreement between Climax and AlphaGary nor AlphaGary's request for separate labeling of the pallets of wet AOM supports a

different conclusion.  In a memo from Cole to Malkin, dated March 6, 1998, Cole referred to the

June 11 shipment, as the first *commercial* sale of X-AOM (emphasis added).  Def.'s Ex. H-16.

Climax's effort to now characterize the transaction as relating to experimental use is a contrived

description, at odds with the facts and with Climax's own characterization before this litigation.

In addition, once an invention has been reduced to practice, it can no longer meet the

experimental use exception.  *See Zacharin v. United States*, 213 F.3d 1366, 1369 (Fed. Cir.

2000).  Climax had reduced the wet AOM product to practice by June 2, 1997, when it sent the

pre-shipment sample to AlphaGary.

The fact that Climax had reduced the invention to practice also satisfies the "ready for

patenting" prong of the on-sale bar.  An invention may be shown to be ready for patenting in two

ways:  "by proof of reduction to practice before the critical date; or by proof that prior to the

critical date the inventor had prepared drawings or other descriptions of the invention that were

sufficiently specific to enable a person skilled in the art to practice the invention."  *Pfaff*, 525 U.S.

at 67-68.

Climax argues that the claimed invention (X-AOM) could not have been ready for

patenting before September 1997, when Climax received a progress report from McCarley,

identifying the existence of the X isomer.  Climax asserts that until then it could not have prepared

a patent application with an enabling disclosure.

Climax's argument fails because "ready for patenting" can be satisfied by proof of

reduction to practice.  In the on-sale bar context, reduction to practice does not require

conception.  The characteristics of the invention need not be fully appreciated or identified when

28

the product was sold or offered for sale.  *See Abbott Labs.  v. Geneva Pharm., Inc.*, 182 F.3d 1315, 1318 (Fed. Cir. 1999).

Climax argues that the holding of *Abbot Laboratories* does not apply because that case involved actual sales before the critical date, rather than an offer for sale.  That distinction is not significant.  The on-sale bar may be triggered by either an offer for sale or an actual sale. Moreover, the question of whether the claimed invention was ready for patenting is a separate inquiry from whether the claimed invention was the subject of an offer or actual sale.

"An invention is reduced to practice when the patentee has an embodiment that meets every limitation and operates for its intended purpose." *Honeywell Int'l. Inc. v. Universal Avionics Sys.*, 488 F.3d 982, 997 (Fed. Cir. 2007) (citing *Eaton v. Evans*, 204 F.3d 1094, 1097 (Fed. Cir. 2000)).  There is no dispute that the 10,000 pounds of wet AOM from Lot WAO21B was an embodiment meeting all the limitations of the '236 patent claim.  By early June 1997,  wet AOM had been shown to useful as a smoke suppressant in coatings for electrical wiring.  The claimed invention was reduced to practice and therefore ready for patenting.  Molychem has shown by clear and convincing evidence that the '236 patent is invalid because of an on-sale bar.

The '236 Patent is Unenforceable

The patent is not enforceable because of inequitable conduct of the applicant before the PTO.  "A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution." *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1313 (Fed. Cir.2006).  Materiality and intent must be established by clear and convincing evidence.  *Id.*  When materiality and intent are both established, the court

29

must weigh those factors to determine if equity warrants a conclusion that the patent is unenforceable. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995). If the withheld material is highly material, a lower showing of intent is necessary to establish inequitable conduct. *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1481-82 (Fed. Cir. 1986). "However, materiality does not presume intent, which is a separate and essential component of inequitable conduct." *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed. Cir. 1988).

PTO Rule 56, 37 C.F.R. § 1.56, describing the duty of disclosure, is one test for determining materiality. The version that governed when the Cole declaration was submitted provided in pertinent part:

> (2)(b) . . . information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
>> (1)    It establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or
>>
>> (2)    It refutes, or is inconsistent with, a position the applicant takes in:
>>> (i)    Opposing an argument of unpatentability relied on by the Office, or
>>> (ii)   Asserting an argument of patentability.

Def.'s Ex. G-16. Another standard for determining materiality is the "reasonable examiner" standard. *See Digital Control*, 437 F.3d at 1314-16. Under that standard, a statement or omission is material if a reasonable examiner would consider the misrepresented or omitted material important in deciding whether to issue the patent. *See Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1363 (Fed. Cir. 2003).

The intent element "must generally be inferred from the facts and circumstances surrounding the applicant's overall conduct." *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1345 (Fed. Cir. 2007) (quoting *Paragon Podiatry Lab., Inc. v. KLM Labs. Inc.*, 984 F.2d 1182, 1189 (Fed. Cir.1993)). "[T]he involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir.1988).

As discussed below, the evidence is clear and convincing that Climax, through Cole and Dahl, overcame the office action by intentional false representations and omissions of material information. The evidence in this case established not only inequitable conduct, but the higher levels of intent and materiality required to prove a *Walker Process* claim. *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068-71 (Fed. Cir. 1998) (discussing distinctions between inequitable conduct and *Walker Process* fraud).

The Antitrust Counterclaim

Molychem's antitrust counterclaim requires proof that Climax defrauded the PTO, losing the patent law exemption from antitrust law under the teaching of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965), as interpreted by Federal Circuit law and the elements of a Sherman Act Section 2 violation as defined by the Tenth Circuit Court of Appeals. Both sets of requirements are summarized in *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341 (Fed. Cir. 2004), *rev'd on other grounds*, 546 U.S. 394 (2006).

In that opinion, the Federal Circuit described *Walker Process* fraud as a variant of common law fraud, requiring proof of "(1) a representation of a material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his reliance on the misrepresentation." *Id.* at 1358.

The elements must be proved by clear and convincing evidence. Molychem has met that burden of proof.

The Kahn patent application claims the substance defined in claim 1 is a newly discovered distinct form of ammonium octamolybdate. The representation made to the PTO is that this substance is unique and distinguishable from other forms of AOM as shown by the three designated peaks in a Raman spectrograph of it.

That representation is false.

The application informed the PTO that this unique isomer of AOM was produced by a unique manufacturing process.

That representation was false.

The Cole declaration in response to the examiner's rejection based on the Huggins patent as obvious, represented that the ISU studies confirmed that the Huggins process did not include the characteristic peaks of X-AOM as defined in claim 1. That much is true. Cole went on to say that while the ISU data showed a small spectral peak at wave numbers 797-798 cm$^{-1}$ at time t = 230 minutes, the other two spectral values of X-AOM were not shown. That statement is true. It is, however, far from the whole truth about the ISU studies. McCarley's conclusion that

32

a mixture of alpha and what he called X was being formed as the heating continued was not

disclosed.  The declaration did not include McCarley's opinion that a variation of the Huggins

process using a higher purity of $MoO_3$ and continuing the reaction time showed a predominance

of X-AOM in the final product as shown in the Figure 12 attached to the October 10, 1997

report, showing four peaks, including the three claimed in the patent.  Pl.'s Ex. 48 at

CM0004760.

Implicit in Cole's declaration was that he was qualified to interpret Raman spectra.  He

was not.

McCarley's Figure 12 was not included in the data attached to the declaration and

McCarley's notations on Fig. 9 were removed.

Dahl knew that McCarley had four Raman Peaks he identified as X, which included the 3

peaks in the claim.  Pl.'s Ex. 71.

These omissions made the declaration deceptive and misleading and that was deliberate.

Malkin's recommendation to reproduce the Huggins process with a Raman spectral

analysis of the resulting product to show that "the Huggins process would not yield an X-AOM

composition" (Pl.'s Ex. 68 at FMI-009392.66) was not followed because Cole, Dahl and anyone

else who read the McCarley report knew that some indication of X would be shown in the data.

Climax argues that there was nothing more than gross negligence in the submission to the

PTO.  The evidence supports a finding of deliberate deception.  Dahl's and Cole's reasons for

erasing the handwriting on Figure 9 and for omitting McCarley's conclusions about mixtures of

alpha and X were self-serving attempts to justify their own deliberate misconduct.

The materiality of the false representations and omissions is apparent.  The examiner had rejected the claims of product and process as obvious under Huggins.  Reliance is also apparent in that the PTO accepted the Cole declaration and allowed claim 1 of the '236 Patent for the stated reason that "the particular ammonium octamolybdate having specific raman spectra wavelength as recited in claim 1 distinguishes over the prior art."  Pl.'s Ex. 60 at 264.

Claim 1 is a contrivance and the PTO was deceived by deliberate misleading statements and material omissions of known information.  The first element of the *Walker Process* counterclaim has been proved.  Climax has no immunity from the Sherman Act.

Liability for monopolization requires proof that (1) a firm has monopoly power in a properly defined relevant market and (2) that it willfully acquired or maintained this power by means of anticompetitive conduct.  Liability for attempted monopolization requires four elements of proof:  (1) a relevant geographic and product market, (2) specific intent to monopolize the market, (3) anticompetitive conduct in furtherance of the attempt and (4) a dangerous probability of success in the attempt.  *United States v. AMR Corp.*, 335 F.3d 1109, 1113 (10th Cir. 2003).

To have standing to recover under § 4 of the Clayton Act, Molychem must prove that it (1) sustained an antitrust injury and (2) a direct causal connection between that injury and Climax's violation of § 2 of the Sherman Act.  *Sports Racing Servs. v. Sports Car Club of Am.*, 131 F.3d 874, 882 (10th Cir. 1997).

Molychem claims that by the effort to enforce its invalid patent claim, Climax excluded Molychem from selling its imported X-AOM to AlphaGary, resulting in lost profit on expected sales.

The proof of antitrust injury is insufficient.  The claim is based on speculation that Molychem would be accepted by AlphaGary as a second supplier of this product.  The only sale Molychem made to AlphaGary was a small one to introduce its product from China.  The evidence shows that AlphaGary had a long standing relationship with Climax and was able to influence pricing and terms of purchase of AOM from it.

Supplying a particular compounder for LSPVC manufacturers is too narrow a definition of a relevant market.  There are other chemicals and products suitable for insulating and jacketing plenum cables.

The counterclaim has not been proven.

Molychem is not without remedy for its losses resulting from the conduct of Climax in its relentless and unjustified prosecution of its claim of infringement of an invalid and unenforceable patent.  Under 35 U.S.C. § 285, the court may award reasonable attorney fees to the prevailing party in exceptional cases.  "[E]xceptional cases are normally those involving bad faith litigation or those involving inequitable conduct by the patentee in procuring the patent."  *Evident Corp. v. Church & Dwight Co.*, 399 F.3d 1310, 1316 (Fed. Cir. 2005) (quoting *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1380 (Fed. Cir.2001)); *see also Bruno v. Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1355 (Fed. Cir. 2005) ("[I]nequitable conduct can be one of several bases sufficient to make a case exceptional for the purpose of awarding attorney fees under § 285.").  The fraud on the PTO warrants a finding that this is an exceptional case.

The litigation conduct in the prosecution of the claim of infringement also supports that finding.  After initiating this civil action, Climax pursued Molychem before the ITC, requiring it to

defend that claim in administrative proceedings and delaying the adjudication of this action.  What is most egregious is the refusal of Climax to accept the ITC decision or to submit the case to this court on that administrative record, insisting that the dispute be tried again because the ITC did not have all of the available evidence.  What additional evidence was produced at this trial not only confirmed the ITC decision, it proved invalidity, unenforceability by inequitable conduct and fraudulent deception of the PTO.  Molychem is entitled to recover its attorneys' fees in defending this civil action and the ITC proceedings.

Upon the foregoing, it

ORDERED, that U.S. Patent No. 5,985,236 is declared invalid and unenforceable.  It is

FURTHER ORDERED, that Molychem, LLC is entitled to recover attorney fees under 35 U.S.C. § 285.  It is

FURTHER ORDERED, that Molychem shall submit a claim for attorney fees for the defense of the Climax claims of infringement in this court and before the ITC on or before November 30, 2007, in a form meeting the requirements of D.C.Colo.LCivR 54.3.  It is

FURTHER ORDERED, that final judgment will not enter until the amount of a reasonable attorney fee is determined to be included in the judgment.  Statutory costs will be determined in the normal procedure of filing a Bill of Costs within 10 days after entry of final judgment.

Dated:  November 1, 2007

BY THE COURT:

s/Richard P. Matsch

_____

Richard P. Matsch, Senior District Judge

36